e Mr. Graham for the appellant. Yes, Your Honor. You may proceed. May it please the Court. Good morning. My name is Joshua Graham, and together with my co-counsel, Ms. Adrienne Flores, we represent Kathy Cutrer. Thank you very much for giving me the opportunity to contribute to the important work that you do. It's an honor to be here today. The primary issue in this case is whether the Tarrant County Workforce Solutions, also known as Tarrant County Workforce Development Board, is subject to the 11th Amendment immunity. The parties in this case is Ms. Cutrer, who is employed by Workforce Solutions, and Workforce Solutions is an entity. It's a general partnership between the cities of Fort Worth, Arlington, and Tarrant County. Ms. Cutrer was involved in a car accident, and in addition, she developed several neurological conditions, which her employer accommodated. At some point, her employer decided to no longer accommodate her, and she filed a complaint with the Texas Workforce Commission. The Texas Workforce Commission then forwarded her complaint to the EEOC, stating that they're familiar with the Workforce Solutions, and they want to make sure that Ms. Cutrer gets a fair shake. The EEOC sent a charge of discrimination, ultimately a right to sue letter, and Ms. Cutrer did sue Workforce Solutions. In the process, before the lawsuit happened, Ms. Cutrer entered into a settlement agreement with Workforce Solutions. After the settlement agreement was executed, and during the rescission period, the attorneys for Workforce Solutions used Ms. Cutrer's personal identifying information to tap into the Medicare system to find out whether she was eligible to receive Medicare benefits, and then said, well, we're going to withhold payment until you fill out all these forms and do everything that we're telling you to do, because based on their information, she was eligible for Medicare benefits. It was right on the timeline where she had just turned 60. Ms. Cutrer was very upset, and she rescinded the settlement agreement, prompting the filing of this lawsuit. There are six factors that this court should consider in determining whether Tarrant County Workforce Solutions is entitled to 11th Amendment immunity. Our argument is not that any Workforce Development Board or any board or even any private entity is barred from 11th Amendment immunity. In fact, under Kline, there have been statutes that the state has passed saying a private hospital, non-profit hospital, you're now an arm of the state because you're doing something that's very beneficial, and we're going to, through you, we're going to serve a state purpose. The most important factor is where does the funding come from? Up until this most recent brief, the Appleys have not disputed our claims that 65 percent or more of their funding comes from the federal government, because the Tarrant County Workforce Solutions administers the Federal Child Care and Development Fund. Out of $58 million, according to their most recent public disclosures, $38 million comes from that fund. That is not a state fund. That is a federal fund. Moreover, unlike all of the other… Counsel, what do you know about that federal fund? Are these like the state block grants that they're basically given to the board to then disperse to recipients? Is that the idea? Yes, Your Honor. It is not only to disperse to recipients, but other entities can apply for funding for subsidies in child care. For example, if you have a daycare and your corporation provides daycare for low-income job applicants or employees, your daycare could be subsidized through that program. I'm sorry. I'm more interested in how it gets to the board, and then the board just disperses it, right? So it's just it comes in from a federal block grant, to call it effectively, and then they disperse it. Can you, since this annual report is so central to the argument on what we've called in Clark and other cases the most important of these prongs, can you walk us through these other sources of funds that the board has? Because I see that they've got this pie chart on the page that you've cited over and over. I don't know what WIOA is, or obviously we know what TANF and SNAP are, but what are these other programs and sources of funds? WIOA is also a federal program, and that is a program that is distributed through the state, and the state distributes to agencies that apply for grant funding. So is WIOA a similar sort of idea? Block grant goes to TWC, then that goes to them? Correct. To them being the board, the defendants here? Correct. And what distinguishes this board from the other boards that receive funding is the other boards are 501c3 corporations. They are incorporated in the state of Texas and registered with the secretary of state. Here, this is a general partnership between the cities of Fort Worth, cities of Arlington, and Tarrant County. They have not registered with the secretary of state, and their bylaws do not specifically align themselves with the state of Texas in any way. Matter of fact, their bylaws and their interlocal agreement state that they are responsible for any shortfall. That the cities themselves, and we know that municipalities and counties are not entitled to 11th Amendment immunity. I recognize that you haven't had discovery in this case, so if you don't know, I understand why. But other fund sources, 486,185, do you know what that is? I don't know what that is, but I do know that the Tarrant County Workforce Solution solicits private funding from private corporations and partnerships. Matter of fact, before the board can even be recognized for grant purposes by the state of Texas, a large percentage of the board must be made up of local businesses. And they solicit those local businesses for opportunities to service the local community. You started out with this part of your argument, mentioning that the workforce gets federal funds. Yes, Your Honor. Why does that matter? Why should we give any... Your Honor, that matters because... Excuse me. Why should that affect it one way or the other? It matters because what the appellees are arguing is that the local Tarrant County Workforce Development Board is an arm of the state of Texas. And the way that they're arguing... Do those federal funds go first into the state treasury? Some of the federal funds first go to the state, to the Texas Workforce Commission, and then to agencies that apply for funding. However, under state statute, under the Texas Government Code, any workforce development board is entitled to apply for funding wherever they can get funding from, whether it be from state funds, federal grants, private grants, private corporate contributions. They can even send out mailers, like the March of Dimes. But if federal dollars come into the state treasury and are then appropriated to the Texas workforce? At times. For the WIP funds, those come in. We know for sure come in through the state. So that militates in favor of a finding that it's an arm of the state? Not necessarily, because the question comes down to who's going to have to pay the bill if there's a judgment? Is it going to come out of the state treasury, or is it going to come out of some sort of federal funds or private funds? In this particular case, I would argue that there's an insurance company that is funding the Apolese litigation, and it would be that insurance carrier. And the Apolese say, well, that's not relevant. What's the most important factor here is that there is an insurance company that's paying for all of this. There's an insurance company listed in their Certificate of Interested Persons. In this particular case, what they want is they want to catch 22. Just like in Alamo Workforce Development, Inc., which was a 2000 case in Texas, they wanted to create a catch 22. They want to say on their website, we're an equal employment opportunity, we cannot discriminate. But if you try to go to the EEOC, they're going to say, we have 11th Amendment immunity. But if you go to the Texas Workforce Commission, the Texas Workforce Commission says, well, we have a working agreement with the local Workforce Development Board, so we're going to send you on to the EEOC. To this day, even though we've repeatedly asked, the Texas Workforce Commission has refused to give us a right to sue letter. They're deferring to the EEOC. And so the Appleys quote Alamo Workforce Development, Inc. several times. The problem is that the Texas Supreme Court in 2013 said that these Workforce Development Boards, they're not a state agency. And in doing so, what the Texas Supreme Court did was they cited to the Texas Sunset Advisory Commission, where the Texas Workforce Commission's own general counsel said that these local Workforce Development Boards cannot invoke immunity in their own right. And the reason is, is that in this particular case, it is a general partnership between municipalities and a county. They're not incorporated. They're not registered with the Secretary of State. And when they went to apply for that debt, the UCC filings say that they're a municipality. They want to have it both ways. But the policy issue here is a grave, grave policy issue. That any entity, any municipality or county could essentially create what it coins as a board, apply to receive state funds, apply to receive federal funds, and then essentially use that board as a vehicle to betray its citizens' rights. And say, well, we're an arm of the state because we receive state funds. Every municipality receives state funds. My school district receives state funds. And so if every single, if they're allowed to create these boards without any kind of oversight. Well, this board has to be certified by the governor, doesn't it? It does have to be certified by the governor if they want to receive state funds. But nowhere in their bylaws, nowhere in their interlocal agreement, nowhere in their articles did they subject themselves, or even cite to the Texas Government Code, subject themselves to the governor's office. Essentially, they're no different than the YMCA. And the reason why I say that is the YMCA applies for grants and they're beholden to the prospect for the grant. Well, the YMCA board doesn't have to be certified by the governor, does it? That's true. But if the YMCA wants to receive state funds, it's going to have to go through certain processes. For example, if the YMCA wants to subsidize its child care program and receive funds through the Texas Agricultural Commission or the USDA or something along those lines, it's going to have to follow the guidelines of whatever the grant perspectives and the policies are to receive those funds. It's no different here. The Workforce Development Board is trying to align itself with other legitimate boards that have incorporated with the state of Texas that are a 501c3 and have gone through different paces simply because they have the same type of name. And that's not what we have here. What we have here is we have a general partnership between several municipalities that receives a lion's share of its funding from the federal government. And what they're looking to do is they're looking to find a way out from being accountable. They advertise on their website, we're an equal employment opportunity employer. And they tell prospective candidates, prospective employees, this is what you're entitled to. These are the rights that we're going to protect. And then they say, we're subject to 11th Amendment immunity if you try to go to the EEOC. What is there in the record in the way of evidence except other than your statement that significant funding is received from the state? We have in the record, we have the 2016 public report that the board publishes to the citizens of Tarrant County. And in that report, it lays out a pie chart of where all their funding comes from. And it says essentially that 38 out of the $58 million that it receives is through child care programs. And so all the information that we've received or that we've – What are child care programs? Child care programs are subsidy programs that corporations or daycares can apply for to fund or subsidize child care. For example, if you have a single mother who can't – And that comes from the state? Well, it comes from the federal government. It's specifically the Federal Child Care and Development Fund. What about the state though? Excuse me, sir? I'm asking about the state. It does not come from the state. It comes from the funds – What does come from the state in this record? I don't know, Your Honor. I know that the Workforce Improvement Opportunity Funds come from the federal government through the state of Texas, and they're responsible for distributing it to the local entities. But as far as specifically what funding comes out of the state treasury that's collected by Texas taxpayers, I don't know. Well, maybe counsel can clear this up. Yes, Your Honor. I see that I'm almost out of time. Thank you very much for allowing me to present my argument today. I really appreciate this opportunity. I'm very grateful to you. All right. Thank you, counsel. Mr. Ross? Yes, sir. May it please the Court, I'm John Ross of Thompson, Koch, Cousins & Irons in Dallas, and I represent the Tarrant County Workforce Development Board. In the brief time that we have here today, I was going to touch on just two points and rely for the remainder of our position on our brief, but given counsel's argument, I think I need to start initially with addressing one thing that was said, the policy argument that he made. This whole case and appeal over immunity really should never have had to happen. The appellant in this case was free under state law, under the Texas Labor Code, where the board would not have had immunity to a disability claim to have filed in state court under the Texas Labor Code and pursued her remedies. He claims that they haven't been able to get a right to sue notice out of the Texas Workforce Commission. Well, under the Texas Labor Code, a right to sue notice is not a statutory prerequisite to sue. All you have to do is file your charge with the Texas Workforce Commission and wait 180 days, and then you can file sue. Now, more than two years have passed and the statute of limitations has been blown. So that's on appellant's counsel and not on the Workforce Development Board. Counsel, can we talk about money? I'm sorry? Can we talk about the money? Yes. The money you get from the, and we've talked about federal money. I'm not as interested in that. I'm more interested, as Judge Wiener was, in the state money. When the state, I have two questions. One is what is the state money that comes to the board? And then two is do you get one penny of state money that is not restricted as grant money that basically you have to pass through to the recipients? That's where the money comes from. They're all grants. He makes reference to the federal funds. It's a block grant to the state, and the funding to the board comes from the Texas General Appropriations Act. The first point I was going to touch on in my argument was to walk the court through the strict statutory and regulatory scheme that governs the board and how it functions. But I understand, perhaps more than most, how the Texas Workforce Commission has, and the statutory scheme for the Legislative Budget Board, I get that. What I'm confused by is the dollars, they come into the, the feds give them to the state of Texas. They're appropriated as every dollar has to be through the General Appropriations Act. And when they come down to TWC and then from TWC to the local boards, those are grant monies that have to be given to grant recipients, right? Like people for workforce training and stuff. It's not money that you could use to, you know, without restriction, rehabilitate the office in Tarrant County or something. Absolutely. Okay. So what is the basis of this sentence that is in this affidavit that you make so much, that says, workforce solutions, sorry, next sentence, it is funded by the state of Texas. That I understand because it's a part of the General Appropriations Act. Any judgment against workforce solutions could put funds from the state treasury at risk. How, how, how? I don't understand. If, if what you're, if the money that you get from the state of Texas is to give to grant recipients, how could the state of Texas ever be on the hook for a money judgment against the board? Well, it's not necessarily that the state would be on the hook to have to appropriate new money to pay a judgment. As we've cited in the brief, it is sufficient for purposes of immunity if the judgment interferes with the autonomy of the state funding system. If the board has to pay money to answer a judgment, the legislature may not have to appropriate new money to pay that judgment, but it's still going to take money away from the board and interfere with the autonomy of that state funding system. Respectfully, that's not what this says under penalty of perjury. It says any judgment against workforce solutions could put funds from the state treasury at risk. How? All I can tell you is I relied on the statement of the General Counsel. And that is not the only Clark factor. Well, the other ones are difficult to apply because, for example, Tarrant County clearly has governmental immunity under state law. It can be waived in certain circumstances, but it's not entitled to Eleventh Amendment immunity. And you certainly don't have any more immunity than Tarrant County would. So the other Clark factors are difficult. This one is easy, and it's the most important, we've said. And I don't understand how this sentence is true. Actually, I respectfully would argue that the board does have more Federal immunity than the City of Arlington because it is an arm of the Texas Workforce Commission, which is a state agency. The board is created by the Texas Government Code. It's subject to all the regulations of the Texas Workforce Commission. The governor has to appoint the counsel. I mean, you can go right on down the line. Before a board can even be created, the governor has got to designate. I totally understand. But we have said, this court has said over and over since Clark, that the most important of these six factors is the money. And you guys filed a declaration in federal court that says any judgment against workforce solutions could put funds from the state treasury at risk. And it's not obvious to me how that's true because you're certainly not talking about the grant money that you guys get from the state because that's restricted by the General Appropriations Act to be paid in accordance with the riders and the regulations for the TWC. Well, the appropriations made to the board aren't necessarily restricted to grant money. The Texas General Appropriations Act appropriates money to the board that's not necessarily just grant money that comes with the kind of restrictions. I'm sorry. Well, that was my first question. I thought maybe I misunderstood. Before we even started this line of question, my first question was, is that the only state money that you get are these block grant monies? My understanding is no. What I thought the court was addressing by its question was counsel's representation that this was all federal money that was going to the board. That's not the case. It goes to the state and then is appropriated through General Appropriations Act to the board. But the money that's appropriated to the board is not limited to just grant money. What other kind of state money is appropriated to the board? Operational money? Things of that sort? It's not just grant money. And if I could, just go back to another way I would answer your earlier question. The statutory and regulatory scheme, including the funding scheme for the Workforce Development Boards, is analytically no different than the scheme in the Perez case, in which this court held that the same sort of multi-tiered funding and regulatory scheme for the educational system in the state of Texas, that the regional educational centers were entitled to federal immunity. It's the same sort of thing. In Perez, it was educational system. In this case, it's workforce development and employment. But the statutory and regulatory multi-tiered funding system is exactly the same. The second point I was going to touch on in argument is the Arbor case that Appellant relies so heavily on in its brief. Appellant mixes state immunity with federal. The question we have here is a question of federal immunity, not state immunity. Arbor was a state court case involving a state court claim for breach of contract against the board under the Texas Tort Claims Act. And the question there was, was the board in that case, the lower Rio Grande Valley, immune under Texas law for that state law claim? And so it has no bearing on whether or not there is federal immunity in this case. They rely heavily on the one statement in Arbor that boards are not under state law considered to be a state agency under the Texas Tort Claims Act. But the court did go on to say that boards were arms of the state precisely because they carry out the charter, if you will, of the Texas Workforce Commission to develop, just quoting from the statute, to establish and operate an integrated workforce development system, in particular through the consolidation of job training, employment, and employment-related educational programs available in the state. So even under Arbor, the state agency, I'm sorry, the Workforce Development Board is considered an arm of the state, even if it's not a state agency, and that's clearly one of the Clark factors, is how is the board considered under state law? Turning back, if I could, to the scheme, I'd just like to finish walking through that process. It starts with, first of all, in order to be entitled to the federal grant money under the Job Training and Partnership Act and the other federal statutes that have existed for decades, the governor's first got to designate workforce development districts within the state. And that begins with him appointing a council required by those federal statutes. The council recommends to the governor a designation of those areas. In this case, it's Tarrant County. It's only after the governor designates those areas that local governments, state governments, can apply for creation of a board. That application has to go to the Texas Workforce Commission. That application is subject to all kinds of regulatory requirements for what it has to include. The board's regulations govern who can sit on the board. It designates particular types of people that have to be on the board. There's got to be a veteran. There's got to be somebody who's trained in early educational development. There have to be certain members of the local business community, et cetera. Going back to funding, the board has to submit an annual budget to the Texas Workforce Commission every year. That budget has to be approved. And it's not just the board that it's submitted to. It's submitted to the governor's office. It's submitted to the legislature's budgeting body. It's submitted to the comptroller. There's heavy state regulation over the board's funding and how that funding is used. Within 90 days of the end of the fiscal year, the board has to submit an annual report on how those funds have been spent. Membership on the board is governed by PWC regulations. It also governs how vacancies are filled. The Texas Workforce Commission may withhold funds from the board and may recommend decertification of the board. So there is heavy state regulation of virtually every aspect of the board's operation, not just funding. Regulations of the Texas Workforce Commission also specify particular services that have to be provided in each of the offices. So this is not some case, as the appellant would suggest in its brief, where the board has complete local autonomy and it's only the city of Arlington and the city of Fort Worth that's running the show. It's just simply not the case. Counsel, how many of the dollars in this annual report, there's $58,668,245, how much of that is appropriated in the GAA? I couldn't tell you. I thought you were going to say it was all of it. I would assume that to be the case, but I don't know. As I understand it, as in Perez, it's a multi-tiered system. It gets delegated down to the Texas Workforce Commission and the Texas Workforce Commission. But if I go pick up our annual budget for the state of Texas, I won't see the local boards, I'll see the TWC line items? I suspect that to be the case. I don't know that, but I suspect that to be the case. Okay. And so the restrictions on the grant funds, presumably, that we were talking about earlier, aren't going to appear in the statute, because the local boards aren't in the statute. It's just going to say these monies are given to TWC for TWC to do with, as specified by the legislature. I believe that to be correct. Unless the Court has any other questions, I yield back the rest of my time. Thank you, Counsel. Thank you. Mr. Gagnon. May it please the Court, I reserve two minutes of time in anticipation of responding to any points that may have been made by Mr. Graham during his presentation. There having been none, if the Court has any questions, I'm happy to respond to them. Otherwise, I would cede my time as well. Thank you. Ms. Flores, rebuttal. May it please the Court, Adrienne Flores for Kathy Couture. The appellee cannot have its cake and eat it, too. It cannot put out publicly that it is publicly funded by Title I funds and is an equal opportunity employer and then refuse to be held accountable by the TWC and then claim 11th immunity in federal court. I want to address some of the points that the appellee brought up, that you've been asking about. There is no risk of money judgment being, it's incumbent on the boards to apply for those grants and to receive them. It's incumbent on the board to make sure that they qualify. Further, if it is as heavily regulated as the appellee claims, then there's no way that the state of Texas could indignify the local boards against any judgments. Assuming the appellee's insurance policy does not cover any type of judgment like this, it would be responsible to fall back on the board and the joint and severally liable partners of the City of Fort Worth, the City of Arlington, and Tarrant County to pay the judgment. Further, I want to address the point where he said, why didn't you just sue in state court? We tried. The TWC must issue a right to sue letter before a person can bring a claim in state court against their employer. The TWC absolutely refused to investigate or issue a finding and refused to issue a right to sue letter. Instead, they sent notice saying, we are forwarding your complaint to the EEOC. At that point, it wasn't even in Ms. Couture's choice to file an EEOC claim. It had already been forwarded. At that point, the EEOC did issue the right to sue letter, and now we have this issue, where the court is placed in a double bind where appellees submit themselves by receiving federal funds and distributing them to the employee protection laws, and yet they're claiming that they're not accountable under the state or federal laws. You said they receive federal funds. They don't do that directly, do they? The notice on appellees' website says that they receive Title I funding, and because of that, they cannot discriminate against any individual on the basis of disability. Further, they say that workforce solutions for Tarrant County must not discriminate in any of the following areas, such as making employment decisions in the administration of or connection with such a program or activity. Further, I want to go back to what those employment activities, the local operations, look like. Texas Government Code Section 2308.103 absolutely forbids the Workforce Investment Council from adopting rules that relate to local regulations, local operations. Once the appellee conforms to the qualifications to receive the grant and applies for the grant and receives it, it is up to them to evaluate the needs of the local community, prioritize those needs, and develop programs that further the objectives for which they received those monies. All of those things lend towards that appellee is very autonomous with what they choose to do with that money, so long as it furthers those objectives. We ask the court that you allow us to proceed, that this be remanded to the district court. Thank you. Thank you, counsel. This concludes our oral arguments for today. The court will take this matter under advisement and we stand in recess until tomorrow morning.